AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

THE MONITORING OF GLOBAL POSITIONING SYSTEM INFORMATION AND CELL SITE LOCATION DATA FOR ONE T-MOBILE CELL PHONE AND SEARCH OF INFORMATION ASSOCIATED WITH THE SAME NUMBER IN VIOLATION OF 18 U.S.C. § 231(a)(3)

)
)
)
)
)
)

Case No. 21-SC-282

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A (incorporated by reference). This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A), and 2711(3)(A). Because the government has satisfied the requirements of 18 U.S.C. § 3122, this warrant also constitutes an order under 18 U.S.C. § 3123

located in the _____ District of _____ New Jersey _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments B incorporated herein and included as part of the attached Affidavit.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 231(a)(3) | - Obstructing or Impeding Any Official Proceeding |
| 18 U.S.C. § 1752(a) | - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority |
| 40 U.S.C. § 5104(e)(2) | - Violent Entry and Disorderly COnduct |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant. To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the requested warrant will also function as a pen register order." An attorney for the government has certified that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the Federal Bureau of Investigation. See 18 U.S.C. §§ 3122(b), 3123(b).

☐ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Special Agent Paul J. West, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means)*.

Date: ___01/26/2021___

_____
*Judge's signature*

City and state:  Washington, D.C.

G. Michael Harvey, U.S. Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means                    ☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>THE MONITORING OF GLOBAL POSITIONING SYSTEM INFORMATION<br>AND CELL SITE LOCATION DATA FOR ONE T-MOBILE CELL PHONE<br>AND SEARCH OF INFORMATION ASSOCIATED WITH THE SAME<br>NUMBER IN VIOLATION OF 18 U.S.C. § 231(a)(3) | )<br>)<br>)<br>)    Case No.  21-SC-282<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

  An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of    New Jersey
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference). This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A), and 2711(3)(A). Because the government has satisfied the requirements of 18 U.S.C. § 3122, this warrant also constitutes an order under 18 U.S.C. § 3123.

  I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachments B incorporated herein and included as part of the attached Affidavit.

  **YOU ARE COMMANDED** to execute this warrant on or before    February 4, 2021    *(not to exceed 14 days)*
 ☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

  Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

  The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    G. Michael Harvey    .
                         *(United States Magistrate Judge)*

 ☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
  ☑ for __30__ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  01/26/2021       _____
                            *Judge's signature*

City and state:  Washington, D.C.        G. Michael Harvey, U.S. Magistrate Judge
                            *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 21-SC-282 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

AO 95
(Rev. 09/12)

# ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

## DELAYED-NOTICE SEARCH WARRANT REPORT

The information on this form should be submitted each time judicial action is taken on an application for a delayed-notice search warrant or for an extension of a delayed-notice period.  See 18 U.S.C. § 3103a(d)(1).
NOTE:   If an extension to the notice period is requested, information will need to be submitted for each extension.

**Please enter the information on this form into the InfoWeb Delayed-Notice Search Warrant Reporting System on the J-Net or into CM/ECF version 6.0 or later, if available.**

For more information, see the Delayed-Notice Search Warrant page on the J-Net.

1. **Name of Judge:**   G. Michael Harvey, United States Magistrate Judge     ( ☐ check if state court judge)

2. **Federal Judicial District:**   District of Columbia

3. **Date of Application for Delayed Notice:**   01/26/2021

4. **Offense (Most Serious) Specified:**

   ☐ Drugs          ☐ Fraud          ☐ Weapons          ☐ Immigration          ☐ Terrorism
   ☐ Sex Offenses   ☐ Theft          ☐ Kidnapping       ☐ Tax
   ☐ Extortion/Racketeering          ☐ Fugitive/Escape/Supervised Release Violation
   ☑ Other *(specify):*   Obstructing or Impeding Any Official Proceeding

5. **Type of Application:**   ☑ Initial request for delay
   ☐ Extension of previously authorized delay
   *(Number of extensions previously granted:* _____ )

6. **Judicial Action Taken:**   ☐ Denied          ☐ Granted          ☐ Granted as modified

7. **Case Number (e.g., 'mc' Number) of Warrant:**   : 21  -  SC  -  282
   *office*    *year*    *type*    *number*

8. **Period of Delay Authorized in This Action (days):**   30

9. **Preparer's Name:**  Jessica Arco          **Title:**  Special Assistant United States Attorney
   **Phone number:**   (202) 431-5198          **Date of report:**  01/26/2021

## ATTACHMENT A-1

### Property to Be Searched

1.      This warrant applies to records and information associated with the cellular device assigned to call number (562) 326-4261 ("TARGET PHONE NUMBER"), owned by RONALD SANDLIN, whose service provider is T-Mobile USA, Inc. ("PROVIDER"), a wireless communications service provider that is located at 4 Sylvan Way, Parsippany, NJ 07054.

2.      Information about the location of the TARGET PHONE NUMBER that is within the possession, custody, or control of PROVIDER, including information about the location of the cellular telephone if it is subsequently assigned a different number.

## **ATTACHMENT A-2**

1.      The subject of this investigation is RONALD SANDLIN.

## ATTACHMENT B-1

**I.     Information to Be Disclosed by Provider**

All information about the location of the TARGET PHONE NUMBER described in Attachment A-1 for a period of 30 days, during all times day or night.  "Information about the location of the target telephone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A-1.  It further includes:

- Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

- Source and destination telephone numbers;

- Date, time, and duration of communication; and

- All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the TARGET PHONE will connect at the beginning and end of each communication, as well as per-call measurements data (also known as PCMD, RTT, NELOSE, TrueCall or similar).

It also includes monitoring non-content signaling and routing information, including all non-content packet switched data, through the installation and use of a pen register and trap and trace device pursuant to 18 U.S.C § 3123 by the service provider and the Federal Bureau pf Investigation.  The pen register / trap and trace device shall be transferable to any change dialed number subsequently assigned to a device bearing the same ESN, IMSI or SIM as the target cell phone; any changed ESN, IMSI or SIM subsequently assigned the same dialed number as the target

cell phone; or any additional changed dialed number, ESN, IMSI or SIM listed to the same subscriber account as the target cell phone.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of PROVIDER, PROVIDER is required to disclose the Location Information to the government.  In addition, PROVIDER must furnish the government all information, facility, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with PROVIDER's services, including by initiating a signal to determine the location of the target telephone on PROVIDER's network or with such other reference points as may be reasonably available and at such intervals and times directed by the government.  The government shall compensate PROVIDER for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

**II.    Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section I. That information that is within the scope of Section I may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section I and will not further review the information absent an

order of the Court. Such sealed information may include retaining a digital copy of all

information received pursuant to the warrant to be used for authentication at trial, as needed.

**ATTACHMENT B-2**

**Particular Things to be Seized**

I.      **Government procedures for warrant execution**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose to the government the following information pertaining to the Account/TARGET PHONE NUMBER listed in Attachment A-1:

      a.   The following information about the customers or subscribers associated with the TARGET PHONE NUMBER/Account for the time period January 1, 2021 to the present:

          i.   Names (including subscriber names, user names, and screen names);

          ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

          iii.   Local and long distance telephone connection records;

          iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

          v.   Length of service (including start date) and types of service utilized;

          vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

   viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records, and

    ix.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the TARGET PHONE NUMBER/Account, including:

        A.  the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

        B.  information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

        C.  all available Mobile Data Session and IPv6 reports and any other location information, including "distance to tower" information or Timing Advance Information or T-Mobile's TrueCall report.

## II.    **Information to be Seized by the Government**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. §§ 1752(a) and 231(a)(3) and 40 U.S.C. § 5104(e)(2) involving RONALD SANDLIN during the period January 1, 2021 to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section I and will not further review the information absent an

order of the Court. Such sealed information may include retaining a digital copy of all

information received pursuant to the warrant to be used for authentication at trial, as needed.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE MONITORING OF GLOBAL POSITIONING SYSTEM INFORMATION AND CELL SITE LOCATION DATA FOR ONE T-MOBILE CELL PHONE AND SEARCH OF INFORMATION ASSOCIATED WITH THE SAME NUMBER IN VIOLATION OF 18 U.S.C. § 231(a)(3) | Case No. 21-SC-282<br><br>__Filed Under Seal__ |

*Reference:      USAO Ref. # 2021R00333; Subject Account(s): (562) 326-4261*

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Paul J. West, Special Agent with the Federal Bureau of Investigation (FBI), having been first duly sworn, so hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41, 18 U.S.C. §§ 2703(a), and 2703(c)(1)(A), and former Chief Judge Hogan's Memorandum Opinion in In the Matter of the Application of the United States for an Order Authorizing the Monitoring of Geolocation and Cell Site Data for a Sprint Spectrum Cell Phone Number ESN, 2006 WL 6217584 at *4 (D.D.C. 2006) (Hogan, C.J.) ("Hogan Opinion"), for information about 1) the prospective location of the cellular telephone assigned call number (562) 326-4261, (hereinafter referred to as the "TARGET PHONE NUMBER"), as detailed in Attachment B-1; and 2) historic location data for the TARGET PHONE NUMBER, as detailed in Attachment B-2[1], whose service provider is T-Mobile USA,

---

[1] Upon receipt of the information described in Section I of Attachment B-2, government-authorized persons will review the information to locate items described in Section II of Attachment B-2.

Inc. ("PROVIDER"), a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.  As a provider of wireless communications service, PROVIDER is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2.     Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  See 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  See 18 U.S.C. § 3123(b)(1).  A certification by Jessica Arco, an attorney for the government, that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by Jessica Arco, is included on the signature page of this affidavit.

3.     I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.  I have been employed as a Special Agent with the FBI since approximately January 2008.  As a Special Agent, I am responsible for investigations of offenses under Titles 18 and 21 of the United States Code, including those that focus on unlawful money laundering and other financial crimes.  I am currently assigned to a squad that is responsible for conducting investigations that target International Drug Trafficking Organizations.  Since October of 2008, I have been working on federal narcotics investigations and have participated in several investigations that led to the arrest and conviction of narcotics distributors.  Since 2008, I have received training and experience in interviewing and interrogation techniques, arrest

procedures, search and seizure, narcotics, white collar crimes, search warrant applications, and various other crimes.  In the course of conducting these investigations, I have been involved in the use of the following investigative techniques:  interviewing informants and cooperating witnesses; conducting physical surveillance; supporting and conducting undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification systems data; conducting court-authorized electronic surveillance; and preparing and executing search warrants that have led to the substantial seizures of narcotics, money, firearms, and other contraband.

4.      I base the facts set forth in this affidavit upon my personal knowledge, information obtained during my participation in this investigation, review of documents to include business and bank records and official government records, knowledge obtained from other individuals including law enforcement personnel, and communications with others who have personal knowledge of the events and circumstances described herein.  Because this affidavit is being submitted for the limited purpose of enabling this Court to make a judicial determination of probable cause to issue a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish the legal basis for the issuance of a search warrant.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1752(a) and 231(a)(3) and 40 U.S.C. § 5104(e)(2) have been committed by RONALD SANDLIN.  There is also probable cause to believe that the historical location information, as described in Attachment B-2, will constitute evidence of these criminal violations. Moreover, the prospective location information described in Attachment B-1 will provide evidence

of where the phone is currently located, and there is probable cause to believe the phone is an instrumentality of the offenses described herein.

6.      Further, SANDLIN was charged with these crimes on January 20, 2021, and is the subject of an arrest warrant issued on the same day.  There is also probable cause to believe that the location information described in Attachment B will assist law enforcement in arresting SANDLIN, who is a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

7.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### *Background – The U.S. Capitol on January 6, 2021*

8.      USCP, the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

9.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple

terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

10.     The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

11.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

12.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

13.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

14.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

15.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

16.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

17.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

18.     Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown

individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which

your affiant believes was a reference to "taking" the U.S. Capitol.



19.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House

of Representatives and United States Senate, including the President of the Senate, Vice President

Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time,

USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.

USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into

the House chamber, by breaking the windows on the chamber door, law enforcement were forced

to draw their weapons to protect the victims sheltering inside.

20.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and

pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol

on both the west side and the east side of the building.  Once inside, the subjects broke windows

and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the

federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained.  .  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

21. Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

22. At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

23. At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



24.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



25.     An unknown subject left a note on the podium on the floor of the Senate Chamber. This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



26.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the US Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





27.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew

beginning at 6:00 p.m.

28.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

29.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

30.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

31.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

32.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

33.     Beginning around 9:00 p.m., the House resumed work on the Certification.

34.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

35.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

36.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

37.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

38.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:





---

[2] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/
[3] https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.



***Facts Specific to This Application***

39.     Following the events of January 6, 2021, the Metropolitan Police Department (MPD) received a tip on its tip line containing what appears to be an audio/video recording of two shorter video clips.  Upon review of this video, your affiant determined both videos depicted the same individual wearing a bright orange sweatshirt, black rimmed glasses with a gold colored nose piece, and a baseball cap inside the U.S. Capitol, who was later identified as RONALD SANDLIN. SANDLIN appeared in the video with several unidentified subjects[5] in the background throughout the entirety of the video.  In the first "selfie"-styled[6] video clip, SANDLIN appeared emotional, stating "we did it."  In the second "selfie"-style video clip, SANDLIN stated "we breached the building, we breached the building, into our Capitol."

---

[4]https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e.

[5] There are numerous individuals who appear in the videos reviewed by your affiant who either have yet to be identified or have been fully identified, but for purposes of this affidavit, your affiant will refer to all individuals but SANDLIN and the U.S. Capitol Police officers as "unidentified subjects."

[6] In my training and experience, individuals take "selfie"-style photographs and videos using digital devices, such as a camera or cell phone with a built-in camera, by holding the device and pointing it towards themselves.

40.     Further investigation revealed Twitter posts from an account named Cleavon_MD. The first post read "Meet Ronnie Sandlin who stormed the Capitol: 'We did it We did it.'"  This post contained a "selfie"-styled video that captured the same scenes and audio as that of the video in the MPD tip described above.  The second post was a photo from the internet of what appeared to be SANDLIN wearing a suit.  The next two photos below were posted on the account appeared to be screenshots from a Facebook account under the name "Ronnie Sandlin."  One screenshot contained what appeared to be videos of SANDLIN walking inside the Capitol building in the same bright orange sweatshirt and black rimmed glasses (see Figure 1), and the other screenshot was a comment posted from the "Ronnie Sandlin" Facebook account on January 6 at 9:56 PM (see Figure 2), which read: "Who has a contact with TMZ and/or Epoch Times?  Thanks patriots.  I have the truth not the media lies.  What I haven't shown will show the REAL truth.  We are not terrorists.  We occupied and for the most part left that place relatively put together all things considered."



*Figure 1*                                         *Figure 2*

41.     The investigation also revealed a New York Post article posted on January 9, 2021, at 5:09 p.m., titled "Video shows rioter smoking pot in the Capitol Rotunda during siege."  Your affiant reviewed this article, which contains photos and videos, including the videos originally received in the MPD tip and photos of SANDLIN in the bright orange sweatshirt and black rimmed glasses inside the Capitol.  In the "selfie"-styled videos, SANDLIN can be heard stating "we made history guys.  People are smoking weed in here.  Please, may I please hit that…I am smoking weed.  Thank you patriot.  We made history in here."  In one video, SANDLIN is observed smoking a type of rolled cigarette consistent with a "joint," which is typically used to smoke marijuana.  Screenshots of the videos can be seen below.



42.     In response to legal process, Facebook provided subscriber information and internet protocol (IP) addresses for the "Ronnie Sandlin" Facebook account described above, including the

following information:  the account had a registered email address of icheckthisemail@gmail.com and was linked to the TARGET PHONE NUMBER.  A search of records lists the TARGET PHONE NUMBER in connection with a "Ronald Sandlin" located in Memphis, TN.   Open records searches further revealed that the above email address and the TARGET PHONE NUMBER were linked to a Facebook account with the username "RevenueExploder" that pertained to a "Ronnie Sandlin" with the same birth date as RONALD SANDLIN, per government records.

43.     In response to legal process, Facebook provided subscriber information for the Facebook account "RevenueExploder," which revealed that the account was registered to the email address of icheckthisemail@gmail.com as well as the TARGET PHONE NUMBER.  In response to legal process, Google provide the following subscriber information related to the email address icheckthisemail@gmail.com:  the account was registered to a "Ronnie Sandlin" and the TARGET PHONE NUMBER.  A search of open source and law enforcement records further connected the TARGET PHONE NUMBER to RONALD SANDLIN.  In comparing images posted to the above-mentioned social media accounts, the images of the "Ronnie Sandlin" captured in the internet postings are consistent with the physical appearance of SANDLIN, as seen in a government photograph of SANDLIN.

44.     Your affiant has reviewed a copy of surveillance video footage obtained from an internal security camera covering a hallway in the U.S. Capitol Senate Gallery with a date and time stamp reading Wednesday, January 06, 2021, at 2:41:28 PM.  This camera provides a view of a hallway and several sets of doors to rooms or areas out of the view of the camera.  The beginning of the video clip showed several unidentified subjects in the hallway.  A U.S. Capitol Police (USCP) officer (hereinafter referred to as "USCP1") is seen entering one of these sets of

doors and is shortly joined by two other USCP officers ("USCP2" and "USCP3").  As part of their official duties, USCP1, USCP2, and USCP3 were clearing individuals out of rooms and securing the doors.

45.     Approximately 27 seconds into the video clip, SANDLIN entered the view of the security camera wearing a bright orange sweatshirt, baseball cap, backpack, a second smaller bag over his shoulder, and what appeared to be camera equipment.  Shortly thereafter, USCP2 and USCP3 moved toward the second set of doors to start to usher people out, while USCP1 finished locking the first set of doors.  SANDLIN is seen walking next to USCP1 as he approached the second set of doors, and while USCP2 is attempting to close the second set of doors.  SANDLIN is observed cutting in front of USCP1 and attempting to wrestle the door away from USCP2.  This wrestling to keep the door open causes SANDLIN and several other unidentified subjects to become engaged in a shoving match with the USCP officers.  SANDLIN is observed backing away from USCP2 and charging back at USCP2, while USCP2 is facing away from SANDLIN.  While this shoving match transpires, the three USCPs are without backup in a hallway surrounded by what appeared to be at least 20 individuals.  As the three USCPs make their way away from the crowd down the hallway and out of view of the security camera, SANDLIN along with several others are observed on the video footage acting in an aggressive manner towards the USCPs.

46.     Further investigation revealed another video posted to the internet of a large crowd of individuals breaching one of the doors leading into the U.S. Capitol.  There are several USCP officers attempting to hold back the large surge of individuals trying to push past them to get inside the building.  A much smaller group of individuals located behind the USCP officers can be seen in the video attempting to remove the USCP officers from the doorway to allow for the individuals outside the U.S. Capitol building to come inside.  In the video, your affiant observed an individual

resembling SANDLIN—with the same bright orange sweatshirt, baseball cap, backpack, and camera equipment—as part of the group of individuals already inside the U.S. Capitol and behind the USCP officers.  SANDLIN is observed reaching out and attempting to rip the helmet off of a U.S. Capitol Police officer (USCP4), while USCP4 is facing away from SANDLIN and attempting to fight back the large group of individuals trying to enter the Capitol.

47.     On December 23, 2020, the user of Facebook account Ronnie.Sandlin posted the following comment: "Who is going to Washington D.C. on the 6th of January? I'm going to be there to show support for our president and to do my part to stop the steal and stand behind Trump when he decides to cross the rubicon.  If you are a patriot I believe it's your duty to be there. I see it as my civic responsibility. If you're going comment below or PM me so we can meet up."  The user also posted: "cool man I'm driving from Memphis if you want to join.  Probably gonna rent a car and drive there.  Assume flights into and surrounding DC will be shutdown because they don't want people to come and they will blame in on Covid."  This comment posted by the Facebook user Ronnie.Sandlin further corroborates that the user of this Facebook account is SANDLIN who, according to government records, lives within 25 miles of Memphis, TN.

48.     Your affiant reviewed another video received as an anonymous online tip.  The video is another "selfie"-style video from inside a restaurant that is approximately ten and a half minutes in length, without any visible indication of the date or time it was recorded.  The majority of the video appears to depict SANDLIN wearing the same bright orange sweatshirt and black rimmed glasses as the individual seen in Figures 1, 3, and 4 above.  Based on some of SANDLIN's statements in the video, your affiant believes this video was recorded prior to the Capitol riot.  In the video, SANDLIN is heard saying:

> Alright so we have been at the protests…we were there pretty early,
> scoped it out…there were some scrimmages, I will upload the video

later…I think a precursor of what is going to [happen] in a few hours.  People are really mad…it is just a precursor to what's going to happen…Either way there is going to be violence.

A little later in the video, SANDLIN states:

What is happening to this country is absolutely horrific, absolutely horrific…we are ready to occupy the state capitol if needed to…I urge other patriots watching this too, to be willing to take the capitol…if you are watching this and you are a patriot and are here, I think it is time to take the capitol and I don't say that lightly…. I am willing to do it, I willing to go and fight for this country.  Even if that means I have to sacrifice in some capacity.  It is not what I want to do…

49.    In the video, SANDLIN appears to hand the device used to record the video to two other individuals who, based on your affiant's involvement in the Capitol riot investigation, your affiant recognizes as JOSIAH COLT and an individual resembling NATHAN DEGRAVE.[7] SANDLIN referred to the individual recognized as COLT in the video as "JOSIAH" before handing the phone over to COLT, and later asked, "Nate, do you want to say something?" before the third individual believed to be DEGRAVE speaks.  Towards the end of the video, SANDLIN stated:

If we need to occupy the capitol, we will occupy the capitol.  You guys are driving all the way to DC and you are missing the rally. We have been at the rally, we went last night, we have been at the rally since six in the morning.  We needed to grab a bite to eat, and like decompress because we went through a few intense moments and also regroup and plan for the next….one o'clock is when it is all going to go down.  So we are going to be there back by one o'clock when it is action time it is game time.

Your affiant believes these statements refer to the joint session of Congress at the U.S. Capitol building that began at approximately 1:00 p.m. Eastern Standard Time (EST).

---

[7] COLT was charged with various offenses in the District Court for the District of Columbia on January 9, 2021. DEGRAVE has not yet been charged in relation to the Capitol riot.

50.     On January 17, 2021, your affiant sent legal process to PROVIDER for subscriber information for the TARGET PHONE NUMBER.  In response, PROVIDER returned the following information:  the TARGET PHONE NUMBER is registered to RONALD SANDLIN, as identified by his date of birth, social security number, and address on file in government records; the account for the TARGET PHONE NUMBER is still active; and on the day of the Capitol riot, the TARGET PHONE NUMBER made or received 35 phone calls or texts.

51.     Your affiant has reviewed several videos and photographs from the internet of a person identified as "Ronnie Sandlin" inside the Capitol as well as a government photograph for an individual named RONALD SANDLIN.  In comparing these images, the images of the "Ronnie Sandlin" captured in the internet postings are consistent with the physical appearance of SANDLIN, as seen in a government photograph of SANDLIN.  In addition, the individual who appeared in several selfie photographs and videos posted to a Facebook account with the username Ronnie.Sandlin has the same distinctive glasses and appears to be consistent with the person seen in photographs inside the Capitol and on video surveillance footage appearing to wear the same glasses, as well as the government photograph of SANDLIN wearing the same distinctive glasses.  Your affiant reasonably believes that based on the subscriber information obtained through legal process, which link RONALD SANDLIN to the TARGET PHONE NUMBER, that RONALD SANDLIN is the owner/user of the TARGET TELEPHONE.

52.     As a result of my personal participation in this investigation, as well as through interviews with and analysis of reports submitted by other agents and law enforcement officers who are involved in this investigation, I am familiar with all aspects of this investigation.  On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, there is probable cause to believe that historical location information

22

for the TARGET PHONE NUMBER will provide evidence of the charged offenses—namely, 18 U.S.C. §§ 1752(a) and 231(a)(3) and 40 U.S.C. § 5104(e)(2).

53.     I submit the facts also show there is probable cause to believe that prospective location information for the TARGET PHONE NUMBER will provide relevant evidence to help enable the FBI to locate and safely arrest the owner/user of the TARGET TELEPHONE, RONALD SANDLIN.  On January 20, 2021, law enforcement spoke with an individual ("Witness 1") affiliated with the former residence of SANDLIN, located in Memphis, TN. Witness 1 informed law enforcement that SANDLIN had broken his lease and vacated the premises in November 2020, and that they had seen him in the Memphis area approximately two weeks ago.  Witness 1 stated that SANDLIN had told him/her that SANDLIN would be heading back to California.  Witness 1 further advised that SANDLIN is a confrontational person and frequently armed.

## BACKGROUND ON CELL-SITE DATA AND LOCATION INFORMATION

54.     In my training and experience, I have learned that PROVIDER is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or "cell tower/sector records."   E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  [Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and,

in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

55.     Based on my training and experience, I know that PROVIDER can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on PROVIDER's network or with such other reference points as may be reasonably available.

56.     Based on my training and experience, I know that PROVIDER can collect cell-site data about the Target Cell Phone.  Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers such as PROVIDER typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

57.     Based on my training and experience, I know that T-Mobile also collects per-call measurement data ("PCMD"), also referred to as timing advance or T-Mobile's "TrueCall" report. Timing advance information estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the

tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

58.     Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

59.     Based on my training and experience, I know that wireless providers such as PROVIDER typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service.  I also know that wireless providers such as PROVIDER typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the TARGET PHONE NUMBER's user or users.

**AUTHORIZATION REQUEST**

60.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

61.     The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A-1 for each communication to or from the TARGET PHONE NUMBER, without geographic limit, for a period of thirty (30) days pursuant to 18 U.S.C. § 3123(c)(1).

62.     I further request that the Court direct PROVIDER to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  I also request that the Court direct PROVIDER to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information unobtrusively and with a minimum of interference with PROVIDER's services, including by initiating a signal to determine the location of the Target Telephone on PROVIDER's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate PROVIDER for reasonable expenses incurred in furnishing such facilities or assistance.

63.     Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, good cause exists under Rule 41 to permit the execution of the requested warrant at any time in the day or night.  Further, pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

**CONCLUSION**

64.     I submit that this affidavit supports probable cause for a warrant to collect the requested information about the location of the Target Telephone, as described in Attachment A, and to seize the evidence described in Attachment B.

Respectfully submitted,

PAUL J. WEST
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on this 26th day of January, 2021

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

---

**Attorney Certification Under 18 U.S.C. §§ 3121-3127**

To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant applied for herein will also function as a pen register order.  I, an attorney for the Government, certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the Federal Bureau of Investigation.  *See* 18 U.S.C. §§ 3122(b), 3123(b).

Jessica Arco
Special Assistant United States Attorney
District of Columbia

---

27

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE
## 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws

of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in

this certification is true and correct.  I am employed by T-Mobile USA, Inc., and my title is

_____.  I am qualified to authenticate the records attached hereto

because I am familiar with how the records were created, managed, stored, and retrieved.  I state

that the records attached hereto are true duplicates of the original records in the custody of

AT&T.  The attached records consist of _____ **[GENERALLY**

**DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.     all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of the regularly conducted

business activity of T-Mobile USA, Inc., and they were made by T-Mobile USA, Inc. as a

regular practice; and

b.     such records were generated by T-Mobile USA, Inc.'s electronic process or

system that produces an accurate result, to wit:

1.     the records were copied from electronic device(s), storage medium(s), or

file(s) in the custody of T-Mobile USA, Inc. in a manner to ensure that they are true duplicates of

the original records; and

2.      the process or system is regularly verified by T-Mobile USA, Inc., and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                                        Signature